Your Honor, this is the third case of the morning of the fall, 217-0085, Buechel v. Brent Gleichauf. On behalf of Mr. Gleichauf, I'm the 1st District Office of the State's Health Defender in St. Caroline, P. Borland. On behalf of the people of the state of Illinois, I'm Mr. Steve Rogers. Ms. Borland, you may proceed. Good morning, Your Honors. May it please the Court, I know the Court is aware we have raised multiple issues in the brief. Today, in the interest of time, I plan on focusing on our second argument regarding the prosecutor's misstatement of the evidence that will, however, address some of the facts of this case and therefore be relevant to the first issue as well. On the second issue, a new trial is required in this closed case because the prosecutor misstated vital tiebreaker evidence important to help the jury resolve the credibility battle between Gleichauf and M.K. In this case, the jury was essentially presented with a binary choice, whether M.K. or Gleichauf was more credible. M.K. testified that Gleichauf sexually assaulted her in two different ways. First, he was inserting the tip of his penis into her vagina, never fully got it inside, and did not ejaculate. Then, following that, he forced her to perform oral sex on him, during which time he did ejaculate. The semen went all over her mouth, and he did not allow her to spit out the semen after that event. By contrast, Gleichauf testified that he and M.K. and his girlfriend had consensual sex that night, that it only involved vaginal penetration, and that he did ejaculate into her vagina. He did also say they had oral sex the night before, at which time semen was also ejaculated. In order to help the jury resolve this evidence, M.K.'s sexual assault case was very important. Those results showed that vaginal swabs collected from M.K. had sufficient semen to develop a DNA profile, and that that profile matched Gleichauf. An oral swab was also collected, and that contained a single-trace sperm cell that was insufficient to develop a profile. In closing, the prosecutor referenced Gleichauf's testimony about oral sex the night before, and kind of described that testimony, and then said, but I want you to remember what the forensics evidence said, what Blake Aper said. He said it was very rare to find even a single sperm cell, even in a case where there had been a claim of oral sexual assault with ejaculation, on an oral swab. She then kind of sarcastically asked the jury, isn't it just damned bad luck for the defendant's sperm to have shown up in her mouth? The prosecutor's argument was a misstatement, because Aper had first never said that Gleichauf's semen was found on the oral swab. He instead said that the semen was insufficient for testing. It was also a misstatement because he had said, he never said it was rare to find any semen on an oral swab. He said it's rare to find sufficient semen to develop a DNA profile. And that was important in this case. The prosecutors' misstatements of that evidence upset the balance of the evidence before the jury. First... Counsel, can I ask you, was the prosecutor's argument that it was the defendant's sperm a rebuttal to defense counsel's argument suggesting that finding only one sperm on the swab meant that the oral sex had occurred on Tuesday evening? I think it was a direct response to that and to Gleichauf's testimony. The problem was that it was a misstatement of the evidence about that testimony. So the prosecutor, in response to defense counsel's argument in that regard, said that theory doesn't work because there was only one sperm cell found. And that kind of denigrated that theory, because if you don't ever expect to find any sperm on an oral swab, as the prosecutor said, then certainly you wouldn't expect to find it 36 hours. So it denigrated Gleichauf's testimony in that regard. But my question is, was it a rebuttal to the defense counsel's argument? Yes. Defense counsel, though, had just stated the facts. He said you don't expect to find that. He kind of explained it as his own inference. You wouldn't expect to find so little DNA on an oral swab, so little semen, given what N.K. described. And the prosecutor's distinction, though, is she said Aper said this and claimed that she misstated the evidence to claim. So it was a response, but it was a misstatement in regard to that response. Didn't your client say that they had consensual sex on the night in question? Yes. Then why do you say that, at a minimum, the convictions based upon vaginal penetration should be reversed? If he supposedly admitted that he vaginally penetrated her, but with consent, and she claims it wasn't, how is a rebuttal relating to whether or not there was or wasn't consent should be vacated or reversed on the basis that there was no penetration? It seems that both parties are agreeing that there was penetration. Yes. We're saying that her account of penetration caused by force was not proven by the evidence in this case. So he claims it was consensual, typical consensual vaginal intercourse. She claimed that he was forcefully putting the tip of his penis into her vagina at the time. We're saying the story told by her does not make sense, particularly because she didn't describe that before trial when giving a detailed narrative. So it should be reversed at a minimum because she's incredible? Yes, yes, that's our evidence. Not on the basis that there was no spermatozoa found in the vagina, correct? Well, there was sperm found in the vagina. Okay, but my point is I'm trying to make sure that I understand that your argument is based upon a controverted issue of fact which relates to whether it was or it wasn't consensual as opposed to whether or not the physical act actually occurred. Okay, yes. We dispute that the physical act of oral sex occurred. We agree that a physical act of vaginal intercourse occurred, but that it was consensual as Gleitchoff testified and not as M.K. testified. And addressing the prosecutor on misconduct argument, when the prosecutor shifted April's testimony to say it was rare to find even a single sperm cell on her oral swab, not only did it denigrate Gleitchoff, but it greatly bolstered M.K. When describing why it is unlikely to find sufficient semen to develop a DNA profile, April said that it's because semen is lost when it is spit out by the complainant, when the complainant brushes her teeth and rinses her mouth. But here, M.K. testified Gleitchoff never allowed her to spit out his semen. She also reported to nurse Tracy Digvani that she did not brush her teeth or have any other oral intake following the assault. So there is something for the jury to consider here. Would you expect to find more sperm here, as defense counsel argued, given her claims? So when the prosecutor said, April said, you don't ever expect to find any, you rarely expect to find any semen on your oral swab, that greatly bolstered her testimony. And so the jury's thinking, oh, if you would never expect to find semen on any swab, then the fact that even one cell was found on hers is strongly corroborative. So in that regard, the prosecutor upset the balance of the evidence, denigrating Gleitchoff and unfairly bolstering M.K. The state tries to kind of diminish the magnitude of this error by noting that the sentence in which the prosecutor made this statement began with the phrase, I think. In other words, she said, I think April said this. But I think it's important to remember a couple of things about that. First, immediately before she said that, she had described Gleitchoff's testimony. And then she said, but I want you to remember what Blake Aper told us about DNA. So she kind of set herself up as the fact checker for the jury about Gleitchoff's testimony. Here's what he said. Let me tell you what the evidence said. In hearing what followed from the prosecutor, the jury wouldn't be focused on the phrasing she used. They'd be focused on what are the facts she discussed. They didn't have a transcript to go back and say, you know what? She couched her argument in terms of, I think. And even if they did catch that, even more importantly, they didn't have a transcript of the testimony from trial to go back and see what Aper actually did say. You know, when I read something, I can say, oh, I don't think that's what they said. And I can go back and look at the testimony. The jury didn't have that benefit. So her argument, her misstatement in this regard, was a clear and obvious error. Accordingly, for purposes of Issue 2, the case becomes, was this case closely balanced? In that regard, there is no dispute that SEBI is the controlling law on this issue. SEBI discusses three factors to decide if a case is closely balanced. Was evidence presented by both sides on the essential elements of the charge against? Did the additional evidence overwhelmingly favor one side or the other? And was one side more particularly credible than the other? I don't think there's any real dispute to the first two elements. Certainly, there was competing evidence in this case. And while the State does say that the additional evidence favored or supported NK, they don't deny that Gleitchoff also had explanation for that evidence. Ultimately, it boils down to the State's claim that Gleitchoff was not as credible as NK, either when describing the charge defense or when describing that additional evidence. But before even looking at Gleitchoff's testimony, we're looking at closely balanced evidence. So what did NK say? Here, she was the State's witness. The State held the burden. She was repeatedly impeached both externally and internally at trial. She had given two prior inconsistent statements in this case, not only inconsistent with her testimony at trial, but also inconsistent with each other. Within the three versions discussed at trial, she was inconsistent on three very important facts. First, where the assault began. She initially said it was in the hall leading to the bedroom, that Gleitchoff dragged her into the bedroom. Then only maybe at most an hour later, she told the nurses that they were already in the bedroom, they were on the bed, and that it began from there. Do you think the fact that the defendant precipitously left, I believe, without even his shirt on and did not go to work for the first day of his job and ended up going to Milwaukee, although everybody would like to go to Milwaukee if they could, don't you think that that evidence tends to impeach your argument relative to whether or not there is a consciousness of guilt? I think it does show a consciousness of guilt, but it also fits with what he described. So what he described was that after having consensual sex with N.K., they got into a pretty heated disagreement. He admits that he punched her. You can see the severe trauma that that caused. It's shown in the photos. And then following that, where if I know then especially where N.K. had said he never did that before, he admits that he held her down on the bed forcefully for ten minutes until she defecated. Those events, especially when we're looking at closely balanced evidence, that also explains why he would want to leave the scene, and it explains N.K.'s demeanor after and running to her neighbor's house in fright. Those are terribly horrifying events for a woman to go through. And again, you have to balance that against N.K., who did have these prior inconsistent statements. In addition to reporting where and how the events began, she also inconsistently reported whether or not she was penetrating in the vagina. She did not say that in her first narrative to the nurse. She said Gleitschoff was being verbally abusive to me while trying to get herself up. And then at trial, it changed to he was putting his penis near my vagina and trying to get it in. And even inconsistently at trial, she had a number of inconsistencies. I think one of the most glaring was she could never account for the act of when Gleitschoff held her down on the bed credibly. She initially said when described to the jury it was immediately after the sexual assault. He punched her. She thought maybe she was going to get up for a second, but then he had her down again, and that's when she defecated. But still on direct examination, only a little bit later, she added in a new series of events where she talked about how she had begged Gleitschoff to allow her to take out her dog. While in the kitchen, he took away her cell phone and her keys. And then the prosecutor said, when did that happen? And she said it was after the sexual assault, but before he defecated on the bed. So she was just even still inconsistent in describing the series, even on direct examination at trial. So if you balance that, certainly there are manners in which the state challenges Gleitschoff's testimony, one of them being his flight from the scene in MKs. An additional one being the state doesn't think Gleitschoff credibly testified as to how the physical fight began, why. How are these so glaring, these inconsistencies so glaring, that a jury would be unable to disregard them or reconcile them and make an ultimate determination of credibility and fact-finding and decide that your client was guilty? Because aren't we supposed to, you're asking us to find that the trial of fact could not have found that these inconsistencies could have been created by the trauma or the psychological trauma that she experienced? For purposes of the reasonable doubt argument, there must be deference given to the jury's findings. We acknowledge that. I just think these are really glaring inconsistencies, including the fact that on the very same morning she was telling different stories that had occurred. And at the same time, you have the evidence that doesn't fully, the physical evidence doesn't fully support her any more than it supports Gleitschoff. He was never impeached. He was the more credible witness. That's for reasonable doubt. I don't think a jury, a rational jury should be able to conclude pretty unreasonably, where she can't even describe basic details. But certainly for purposes of the prosecutorial misconduct argument, you balance her inconsistencies, her impeachment, against Gleitschoff. And he's providing an alternative series of events. That's exactly what SETI says is a closely balanced case. So you're saying that maybe you're not saying this, but it is a possible explanation or interpretation of your argument, and that is that a consistent liar is more believable than an inconsistent truth teller. Who would be the consistent liar, I guess, is my question. Well, that's what the jury determined, isn't it, that he was a consistent liar? Because you're saying that he was consistent. They say he was a liar. Therefore, he's a consistent liar. I mean, but consider that the jury made that finding. I can finish this up. The jury made that finding without understanding the true meaning of the physical results of the sexual assault case, thinking that you don't expect to find one sperm in an oral swab ever, or very rarely. And that's really important. Jurors are really swayed by DNA evidence. That's really compelling. If you have everything else, there are competing issues, and each party gave evidence on that. So I can move. Okay. You'll have an opportunity to make rebuttal. Thank you. Thank you. Mr. Rogers, you may proceed. Good morning, Your Honors. Counsel, may it please the Court. My name is Stephen Rogers, and I represent the people of the state of Illinois. Your Honors, I'll start in the same manner the defense counsel did. I'll discuss Issue 2 and then transition into Issue 1. First, defense counsel claims that two different misstatements occurred in the closing argument, the second being that defendant's sperm specifically was found on M.K.'s oral swab. But I think that fact was essentially agreed to by the parties. Defense counsel said it was defendant's sperm cell from Monday evening during consensual oral sex, and the state's case was that it came from Tuesday evening during non-consensual oral sex. These aren't dated, are they? They're not, Your Honor. So both parties agreed that within 36 hours before the swab was taken that oral sex had occurred with ejaculation. There was a dispute as to the day. So I don't think that that could be considered a real misstatement of the evidence in the case. And as to the description of the expert's testimony, the state agrees that it was not an exact recitation of what the expert said. But unlike a case like Linscott, it was a logical extension of what the expert said. The expert testified that it is very rare to ever obtain sufficient male DNA to get a DNA type when an oral swab is taken after a claimed oral sexual assault. The expert also testified that when a victim spits, rinses, washes, or takes a drink, all of the potential DNA is washing away. And finally, even without those actions, the mouth is constantly cycling in new saliva, which rinses away DNA evidence. The state's position was that from Monday evening to when the test is taken on Wednesday, around 36 hours passed, and we know that she ate dinner Tuesday night. She presumably had drinks. She testified, M.K. testified that she ate breakfast at work, and she took a shower after the sexual activity on Tuesday. So with all that, the state's position was that it would be highly unlikely that any sperm would remain in M.K.'s mouth. And just to distinguish Linscott, which is one of the main cases, and Linscott, the expert, testified that the seminal material had come from either a non-secretor or a secretor that had type O blood. And the state, in both opening and closing argument, testified that the seminal material was deposited by a non-secretor, which matched the defendant, who was also a non-secretor. That was not a logical extension of the expert's testimony. It was actually in direct contradiction to the expert's testimony. So it was a non-sequitor and a non-secretor? Yes, Your Honor. And, you know, even if there was error to impute that inference to the expert's testimony, a defendant still has to establish before we even get to plain error that there was reversible error. And reversible error requires improper remarks that engendered substantial prejudice, such that it is impossible to say whether the guilty verdict resulted from the remark. And this was just not the type of case when you have the magnitude of evidence, both physical, you have direct evidence, you have the flight, you have a bamboo stick laid out in the middle of the floor, you have the belt that's left behind in a looped position. So the State's position is that there was no reversible error, and even if you get down to the plain error prongs, it wasn't a close case, because you have defendant's implausible testimony, and then you have M. Case testimony, which is corroborated by the physical evidence. Well, what about inconsistencies in M. Case testimony? Your Honor, if you look at the accounts, it's somewhat difficult, because she gives her first statement to Officer Woodruff. She's visibly upset and crying. This is a five-minute interview where Woodruff is just trying to get down what happened. So he makes some shorthand notes. That gets turned into a summary later. M. Case never reviewed that statement. And so she actually testified. The big inconsistency from the defense is that she said she was dragged into the bedroom by her hair, and that's the way it initially started. That was in Woodruff's report, in his testimony. M. Case said that that actually occurred later. So the fact that maybe that's the first thing she said to him, and he wrote it down in that sequence, I don't think that undermines the whole of her testimony. Not being able to explain how her hands got free. Her hands were over her head. I mean, whether her hands slipped out or the belt came loose or the defendant loosened his grasp on the belt, that's not the type of inconsistency or lack of explanation that would undermine the whole of her testimony. And I think that's the big distinction between cases like Herman and Yergin, where you have such great inconsistencies that it calls into question the whole of the testimony. In Herman, that's the timeline. The victim had stated the activities occurred anywhere between 3 and 5.30, and the officer could account for all but about 25 minutes of his acts on that morning. And so along with the testimony, which the court considered fraught with inconsistencies, that went exactly to the heart of the case and whether the acts could have occurred at all. And the same could be said for Yergin, where the complainant testified that she was forced into a garage and her clothes were forcibly removed. There was no physical evidence. There were no tears in the clothing, no evidence of physical abuse, and the court found that that called into question. It should also be noted that usually when courts discuss Yergin, they call it a rare case that an appellate court is going to completely review and weigh the evidence on appeal. What's your attitude about the registration requirement or the arguments against registration? Well, Your Honor, in the state's brief, it's essentially a jurisdictional issue. The registration requirement is not a punishment imposed by the trial court. It's a regulatory matter, and so on direct appeal from a criminal conviction, it's not within the purview of Illinois Supreme Court Rule 615, which allows this court to affirm, reverse, or modify a judgment of the trial court. You're saying that we don't have jurisdiction to grant the relief that's being sought by this claim? Yes, Your Honor. There's no jurisdiction at this point to grant the relief, which is removal from the registration requirement. And the court in Bingham gave two express times where that could be challenged. One is upon a conviction for failure to comply or in a civil action. A declaratory action. A declaratory action to ask the court to find an unconstitutional statute. Would you say that issue is firmly resolved? The argument that I just stated? I believe so, Your Honor. The court in Bingham was very clear that I cited two First District cases after Bingham that dismissed that portion of the argument for lack of jurisdiction when the defendants requested the exact same relief. So if Your Honors have no further questions, the State respectfully requests that you affirm the defendant's convictions. Thank you. Ms. Gorlin, you may proceed. I don't know how to be very brief. Can you speak up a little louder, please? Oh, sure, yes. I think this case is very close to Linscott and Giangrande. In both cases, it was an exaggeration of DNA evidence, particularly Giangrande. The evidence said hairs were found at the scene microscopically identical to the defendant's. The prosecutor referred to the defendant's hair in closing. That's very similar to what we have here. Linscott also referring to similar hair as belonging to the defendant in addition to the secretion stuff. So I think the law is very much on our side as whether there was an error in this case. And also, in terms of this being a logical inference, had the prosecutor herself said, you know what, if it's rare to find sufficient semen to find a DNA profile, you wouldn't expect any sperm to be there 36 hours later. That's one thing. But saying that's what the science says, that's what APER told you, and that's how you should check by just testimony, that's a lot different. And again, jurors are swayed by DNA evidence. In terms of prejudice, the test for Sebi, under Sebi, is if there's clear and obvious error, prejudice occurs. Did the witness actually say that his opinion was based upon his science as opposed to based upon his personal observations, i.e. anecdotal evidence? It was just based on his personal observations. But I do think having a forensic scientist tell you something versus a prosecutor's inference is a significant difference to the jury. And we do, in a closely balanced case, the prejudice comes from the fact that an error was made. But certainly I think prejudice can be found here for the manner in which I described earlier because it unfairly bolstered in-case testimony at the same time it didn't rate it. Could you explain to me how this is prejudicial? Because I'm having a hard time visualizing the difference between one sperm and no sperm or one sperm and two sperms in the mouth and how that would affect the jury in determining anything other than six of one, a half dozen of another. I think it's not so much one sperm versus two sperm, but you don't expect to find any DNA or any semen on an oral swab versus you don't expect to find enough for DNA testing. But doesn't this boil down to a question of force or consent? Not at all. And if that's the case, how does the number of sperm or the lack of the number of sperm or ambiguity, vagaries, or whatever, relate to whether or not that sperm was there based upon an invitation or not? Because the oral sex glideshopped a night entirely on the night of the events. So that was not a matter of consent versus non-consent. That was in-case saying it happened, glideshopped saying it didn't. Am I to understand that your argument is that if it had taken place on the night in question that there would have been more sperm there? Yeah, if it would have taken place. What in-case said or what glideshopped said? I'm sorry. I was asking you what your argument is. Is your argument that the fact that there are so few there that that would indicate that it was the prior evening instead of the night in question? That's something for the jury to consider, especially given in-case testimony she wasn't allowed to spit out her semen, that she didn't report it to the nurse, that she did not brush her teeth or have any other oral intake. Because when April said why you can't get enough semen to develop a DNA profile, those are the factors that you mentioned. You lose evidence in terms of that. Thank you. And real quick, there was the evidence about the belt and the injuries with M.K. Glideshop had independent explanations for that. He said he hung his belt on the closet door. He was definitely running out partially closed the next day. The injuries, I would like to remember it was one centimeter on her shoulder here, not anything around her neck, as she described. And he also said there had been bondage the night before. And in terms, real quickly, if I could address Your Honor's question about SORA, we believe Rodriguez does give this court a way around being able to cite it in the reply brief as a First District case. They said when the trial court makes imposition of SORA a part of the judgment, that is something that you can review on direct appeal. Certainly the trial court did not expressly order SORA here, but definitely it was implicit in the judgment because Glideshop did not have to respond otherwise. So this court could extend Rodriguez in that regard. And Bingham was unusual because it was a prior sex appeal. Finish what you were going to say. Bingham was distinguishable because? The defendant had committed a new non-sex crime that triggered his registration for a sex crime he had committed like 15 or 20 years ago. Fair amount of theft, I think. Yeah. And so the facts regarding his recidivism and all that underlying sex abuse weren't present. So if this court were so inclined, it certainly could extend Rodriguez. Does this court have any other questions about that? Any other questions? So that's the basis of your argument about the registrations. You think that Rodriguez, though it doesn't, factually doesn't apply here, is still a reasonable argument. I do think it is because it is part of what happened to him in this case. As a result of this conviction, he does now have to register. As a result of as opposed to a court order? That is a difference. Isn't that a pretty significant difference that Bingham has sort of put asunder? I think if this were given that this is on this case, I do see the difference, but it is implicitly part of this order, but for this case. Otherwise, you have to make light shots. He has to specifically violate the sex offender laws and get a new conviction to challenge it, or he has to file the declaratory judgment. But we are, I mean, I do think it's a way that you can extend Rodriguez, but I also understand if this court feels otherwise. We are making this to preserve it in the elements of the court as well. What is your response to Mr. Rogers' argument that the Supreme Court rules do not grant us the authority to grant you the relief that you're requesting? Well, Bingham doesn't totally apply to direct appeals like this. I'm not talking about Bingham, I'm talking about Supreme Court rules. I would say I can do a little more research on that. I don't have an answer to that. I'm happy to provide a supplemental brief. I don't know what rule specifically you're talking about, but in Rodriguez, they did address this sort of issue, notwithstanding. So if this court has no further questions, we ask this court to either reverse their child's convictions outright or grant them a new trial. Thank you. If we have other cases on the call, there will be a short recess.